COMMONWEALTH *vs*. JEFFREY T. MILTON.

No. 99-P-425.

Middlesex. March 15, 2000. - July 6, 2000.

Present: KASS, GILLERMAN, & JACOBS, JJ.

*Practice, Criminal,* Assistance of counsel. *Constitutional Law,* Assistance of counsel. *Insanity.*

Evidence at an evidentiary hearing on a criminal defendant's motion for a new trial demonstrated that his trial counsel had failed to investigate a lack of criminal responsibility defense, which was the only viable defense, and the judge who received the defendant's plea of guilty erred in failing to recognize on the record before him that defense counsel should have at least requested a psychiatric examination: the defendant was deprived of the effective assistance of counsel and a new trial was required. [560-562]

COMPLAINT received and sworn to in the juvenile session of the Malden Division of the District Court Department on September 2, 1987.

On transfer to the Superior Court Department, an indictment was found and returned on June 2, 1988.

Following review by this court, 40 Mass. App. Ct. 1111 (1996), an evidentiary hearing on a motion for a new trial was heard by *James D. McDaniel, Jr.,* J.

*Maxine Sushelsky* for the defendant.

*Thomas D. Ralph,* Assistant District Attorney, for the Commonwealth.

GILLERMAN, J. After an evidentiary hearing ordered by this court, a judge of the Superior Court, for the second time, denied the defendant's application for a new trial which was based on the claim that his trial counsel was ineffective, depriving him of his Federal and State constitutional rights. We reverse, and order a new trial.

The background events are these: On September 21, 1987, the defendant was arraigned on a juvenile complaint issued in

the Malden District Court charging the defendant with assault and battery with a dangerous weapon. The episode occurred on August 31, 1987; the defendant was then sixteen years old. The complaint was dismissed at the Commonwealth's request, see G. L. c. 119, § 61, on March 28, 1988. Thereafter, the Middlesex grand jury indicted the defendant on the same charge. The defendant was arraigned in the Superior Court on June 22, 1988, and Mr. John V. Young was assigned to represent him. On August 15, 1988, the defendant offered to change his plea. The guilty plea was accepted by the judge, and the defendant was committed to Massachusetts Correctional Institution, Cedar Junction, for a term of from four and one-half to ten years.

The defendant's motion to vacate his conviction and for a new trial was first filed pro se on December 6, 1988, and later refiled by his appellate counsel on October 6, 1994. In his affidavit filed in support of the new trial motion, the defendant asserted that, as a result of the lack of investigation and preparation by Mr. Young, he had received ineffective assistance of counsel, and that he pleaded guilty on the advice of Mr. Young, who told him that if he did not plead guilty he would receive a sentence of from nine to ten years, rather that the four and one-half to ten years he could expect to receive by pleading guilty.

On March 28, 1996, we released an unpublished memorandum and order under rule 1:28 responding to an order of a judge of the Superior Court denying, without a hearing (1) the defendant's motion to vacate his conviction and to dismiss the indictment, and (2) his motion for a new trial and other postconviction relief. We affirmed the denial of the defendant's motion to vacate the conviction and dismiss the indictment. We reversed the order denying the motion for a new trial and remanded the matter to the Superior Court "for consideration of the defendant's motion for discovery and, after an opportunity for any reasonable discovery, for an evidentiary hearing on the motion for new trial, and the making of findings of fact pursuant to Rule 30(b)." This appeal is from the order entered August 11, 1998, again denying the motion for a new trial after the required evidentiary hearing.

In our memorandum ordering an evidentiary hearing on the new trial motion, we said there was a substantial issue regarding the claim of ineffective assistance by Mr. Young. We referred to "the transcript of the proceedings of the plea hearing, the defendant's psychiatric records detailing a long history of his

inability to control his impulsive and violent behavior, the descriptions of the crime itself, and [Mr. Young's] refusal or failure to release pertinent records or provide information to present counsel, which might have shed light [on] an otherwise inexplicable decision to ignore a seemingly viable defense of lack of criminal responsibility . . . ."

*The plea hearing.* We summarize certain events in the record before us on the first appeal and which are part of the record on this appeal. At the sentencing phase of the hearing in the Superior Court following the defendant's change of plea, the Commonwealth represented that, had the case gone to trial, it would have proven the following facts: On August 31, 1987, Charles Bishara (witness) saw the defendant screaming and kicking passing cars. The witness heard the defendant yelling at his girlfriend, "Do you want to see me stab someone?" The witness approached the defendant to tell him to "knock it off." The defendant attacked the witness and stabbed him in the leg, arm, back, and shoulder. There were two other witnesses to the incident.

The wounded witness fled, chased by the defendant. He escaped, and was taken to a hospital where he stayed for two days.

The defendant's girlfriend (Smith) testified before the grand jury that the defendant grabbed a knife in Smith's pocketbook. According to Smith, the defendant "said that if I wanted to see him hurt somebody, he'd hurt the next person that walked by, and [then] he was in the car, in the street, kicking cars and screaming." The judge, referring to a report of the Malden police department, found that another witness saw the defendant "going berserk, yelling, screaming, kicking cars on Main Street and telling people to come out of their cars."

Continuing with the sentencing phase of the plea hearing: Mr. Young addressed the court. He appealed to the judge on the basis of the defendant's age, seventeen. He made no mention, by way of mitigation, of the defendant's prior emotional difficulties and hospitalizations, or the related reports, all of which we describe below. Secondly, Mr. Young conceded that the "offense does warrant some incarceration," but not "nine to ten," that being the anticipated recommendation of the Commonwealth. Having made those two statements Mr. Young ended his sentencing argument. His statements to the judge occupy merely seventeen lines of the transcript.

The prosecutor, justifying what the Commonwealth called its "stiff recommendation, nine to ten," told the judge that the defendant had a history of "very, very violent behavior . . . including an occasion when he stabbed a staff member in the arm; he slashed another juvenile in the throat with a pair of scissors. That happened to be an unprovoked attack. He was found, during a transfer hearing . . . to be *potentially homicidal* and not amenable to rehabilitation"[1] (emphasis added).

The judge responded to this description of the defendant's behavior:

THE COURT: "Well, he does have an assaultive background. *I don't know what it is. I don't understand why* but he's been in all kinds of difficulties as a youth; he's only a youth now. Going back to when we was thirteen and fourteen; fourteen especially when he started getting into these difficulties . . . . He had a troubled childhood, I see here. A lot of DYS commitments. He was committed there repeatedly. *I don't know what's wrong with him. Has he ever been evaluated in any way to find out why he has these aggressive tendencies*?" (Emphasis added).

MR. PASQUALE: "Your Honor, my record indicates that he has received extensive hospitalization treatment, McLean Hospital, Gay — [blank], Charles River Hospital . . . ."

THE COURT [to the defendant]: "I thought you said you had never been treated by a psychiatrist or psychologist?"[2]

MR. MILTON: "Not this year."

THE COURT: "All right. That's fair. *What were they treating you for at McLean's*?" (Emphasis added).

MR. MILTON: "*Problems I had.*" (Emphasis added).

THE COURT: "Problems you had at home? *You are going to have to stop that assaultive conduct.* Do you know what is

---

[1]The account of the defendant's behavior was put forward in justification of the Commonwealth's recommendation of the longest possible sentence for the defendant.

[2]The judge had previously asked the defendant, "Have you ever been seen or treated by a psychiatrist or psychologist within the past year?" The defendant replied, "No."

going to happen? Either you are going to get killed or you are going to do something to somebody and be in prison for the rest of your life. Is that what you want?" (Emphasis added).

MR. MILTON: "No."

THE COURT: "Mr. Milton, would you please rise . . . ."

Mr. Young made no attempt to answer the judge's concerns in ways that could benefit his client. We emphasize Mr. Young's silence in the face of the judge's statements, just quoted, that the defendant's difficulties go back to when he was thirteen, and his statements that he did not know what was "wrong" with the defendant. The judge wanted to know — but was never told — whether the defendant had ever been evaluated. In his memorandum and order the judge wrote, "[E]vidence of the defendant's psychiatric history was before the court and the defendant had several opportunities to inform the judge of his history had he so chosen." The silence of Mr. Young had its effect.

In note 3 to his memorandum and order following the plea hearing, the judge wrote:

> "The defendant was born January 24, 1974.[3] His juvenile record includes the following Department of Youth Services (DYS) delinquency dispositions: 1) June 3, 1985 [defendant then fourteen years old], attempt to commit crime, malicious destruction of property, attempt to commit crime and possession of burglarious tools, as to each DEL DYS CMTD; 2) September 9, 1985, Poss Class D Cont Sub, DEL CMTD DYS; 3) August 12, 1986, B&E NIGHT, DEL CMTD DYS; 4) May 5, 1987, three counts A&B/DW, DEL CMTD DYS."[4]

*The evidentiary hearing.* Mr. Young appeared in response to

---

[3]The judge appears to be in error as to the age of the defendant. A transfer order in the Juvenile Court states that the defendant was born on January 24, 1971. Thus the defendant was 16 at the time of the stabbing incident, and he was 17 when he appeared before the judge in the Superior Court.

[4]The defendant was arrested on September 18, 1987. That evening, the judge found, "the defendant refused to stop kicking and banging his jail cell door and an overhead light despite being ordered to do so by the police. Eventually, he succeeded in breaking the light leaving him in darkness in his cell. When the police attempted to transfer him to another cell, the defendant

an out-of-State witness summons and testified in the Superior Court. He was asked, on direct examination by the defendant's counsel, if he knew "that Mr. Milton was a juvenile at the time the case began, [whether he] would . . . have read the transfer order. [See note 4, *supra*]." Mr. Young answered, "That would have been the proper procedure, yes." When offered to be shown the findings and order after the transfer hearing, Mr. Young replied that that would not help because, "I can't remember anything but some very, very basic and general facts of the case, and this is not going to help me refresh my recollection."

The transfer order regarding the charge against the defendant, which was admitted at the evidentiary hearing without objection, is not dated, but it refers to the transfer proceedings which took place on March 28, 1988. Attached to, and incorporated into this transfer order, was a previous extensive and detailed transfer order of a Juvenile Court judge dated June 12, 1987, based on an incident which took place on December 12, 1986, eight months before the episode in this case. The defendant had attacked a probation officer. The Juvenile Court judge's findings included the following:

> "Despite five psychiatric hospitalizations and treatment in five Department mileau [*sic*], including two secure treatment facilities, Jeffrey exhibits limited insight and poor judgment and is *barely in control of his behavior*. Rage is the feeling he expresses to avoid expressing feelings, others are constantly in danger of assaultive, out-of-control, angry behavior. This disassociation from his emotion allows him to act out aggressively and shows his many fantasies." (Emphasis added.)

The judge concluded that there was clear and convincing evidence that the defendant was not amenable to rehabilitation because the defendant had five psychiatric hospitalizations since 1981, he had four DYS placements including two secure placements, he was a "danger to the public as he is provocative and threatening to others," he "has been *unable to conform his behavior* to stay engaged in therapy for a period which is extensive enough for the court to conclude that the DYS juvenile

resisted their efforts, he became aggressive and attempted to punch one of the police officers. He was eventually subdued by two officers and transferred to a padded cell."

system could be available to use as a sentencing modality," (emphasis added), and the public safety required confinement.

Mr. Young testified that he had no memory of these transfer orders, but had he known that the case began when the defendant was a juvenile, it would have been "proper procedure" to read the transfer orders. Mr. Young also testified that he did not recall being aware of a clinical evaluation of the defendant done on January 17, 1987, by Jeanne Tomich, Ph.D., nor did he recall being aware "that [on March 6, 1987] a Dr. George Hardman, M.D., had evaluated Mr. Milton and stated that there was a possibility that he had a neurological dysfunction and recommended a thorough neuro-behavioral evaluation of Mr. Milton." Reading the Tomich report did not refresh his memory, and he was then asked, "[D]o you agree that it would be proper procedure to look at the reports that were considered by the Judge for that transfer order . . . for purposes of representing Mr. Milton in the Middlesex Superior Court?" Mr. Young answered, "Yes, it would be proper."

Mr Young was also asked whether he remembered reading the Hardman report. He answered that he could not recall the report, but he agreed with defendant's counsel that the Hardman report "would have been relevant to [Mr. Young's] . . . representation of Mr. Milton in 1988."

The findings and transfer order and the reports of Dr. Tomich and Dr. Hardman were admitted as exhibits without objection. The report of Dr. Tomich recites the following:

> "Jeff is being presented . . . on charges of Assault and Battery on a Probation Officer while A.W.O.L. from D.Y.S. He has assaulted D.Y.S. and court staff since his arraignment. . . Jeff has a history of many behavioral problems. He has had five psychiatric hospitalizations and has several prior D.Y.S. commitments. He was transferred out of one D.Y.S. secure treatment facility after assaulting a staff member. There are longstanding school and family problems in addition to Jeff's history of drug abuse. *The referral question is* whether he is amenable to further treatment efforts in D.Y.S. and *whether he is criminally responsible*" (emphasis added).

The report does not answer the underscored question. However, the report does conclude that

"Jeff [is] . . . a deeply disturbed young man with severe characterological problems. He is assaultive and has the potential to be homicidal. Usual methods of treatment are ineffective. . . Jeff would require a specialized treatment program of several years. . . There are few facilities in the country capable of dealing with Jeff. The alternative is the adult justice system which would reinforce Jeff's view of himself and the world. *It is recommended that the severity of his pathology be recognized* and an attempt at treatment be made. *His potential for dangerous behavior is high* in any case but there is more chance that he will change with treatment."

Dr. Hardman's report is more extensive. Toward the end of his report he states, "[t]here is no mention in the records available to me of any neuro-behavioral evaluation, and I would strongly recommend that this be carried out. While there are certainly many psychodynamic reasons to account for the problems that Jeff has been having, there are also suggestions of possible neurological dysfunction. Racing thoughts as described by Jeff can be a symptom of temporal lobe seizure disorders." He concludes with his recommendation that the defendant undergo a neurobehavioral evaluation. There is no indication in the record that any such evaluation ever took place.

In the summer or fall of 1989 (the date of the letter is missing), the defendant complained to the Board of Bar Overseers regarding the inadequacy of Mr. Young's representation. The defendant insisted he was innocent. In response, Mr. Young wrote bar counsel on September 11, 1989, one year after the plea hearing, that "I did not file discovery motions because *all discovery, including witness statements, were provided to me by the assistant district attorney*. . . I never told Mr. Milton that he had a 'no win' case, but rather that his chance of prevailing at trial was extremely small. . . I never told Mr. Milton that I filed motions in his case. What I did tell him was that he had no motions and that to file any would be a frivolous act" (emphasis added).

Mr. Young's letter concluded: "[t]his complaint is pure unadulterated bull not to mention insulting. It's [*sic*] source is *a dangerous yet pathetic boy* who is not man enough to accept that the deal which he willingly accepted was the best he was going to get. Please be sure to forward a copy of my response to Mr. Milton" (emphasis added).

In 1996, in preparation for the evidentiary hearing, the judge allowed the defendant's motion for funds to hire a psychiatrist. Appellate counsel engaged William Berger, M.D., to conduct a psychiatric evaluation of the defendant as of the date of the stabbing episode. In 1992, Dr. Berger had evaluated the defendant regarding Federal charges then pending against the defendant. Dr. Berger's affidavit is in the record. Attached to the affidavit is his 1992 report. In addition, Dr. Berger was provided with all the police records and medical records of the defendant regarding the stabbing episode. Based on all the foregoing, it was Dr. Berger's opinion "that at the time of the incident in question, Jeffrey Milton, by virtue of a mental disease or defect, impulse control disorder otherwise unspecified, lacked substantial capacity to conform his conduct to the requirements of the law." The affidavit is dated October 7, 1997.

*Discussion.* The defendant argues that, because of the ineffectiveness of his trial counsel, the issue of the defendant's criminal responsibility was entirely overlooked, depriving the defendant of his only defense to the charge against him.

It is settled law in this Commonwealth that the "failure to investigate an insanity defense falls below the level of competence demanded of attorneys if facts known to, *or accessible to,* trial counsel raised a reasonable doubt as to the defendant's mental condition" (emphasis added). *Commonwealth* v. *Roberio,* 428 Mass. 278, 279-280 (1998). See *Osborne* v. *Commonwealth,* 378 Mass. 104, 111 (1979), and cases cited; *Commonwealth* v. *Doucette,* 391 Mass. 443, 458-459 (1984); *Commonwealth* v. *Gould,* 413 Mass. 707, 711 (1992). As in *Osborne* v. *Commonwealth,* 378 Mass. at 109, "[t]he issue is whether counsel should have investigated an insanity defense before advising the defendant to plead guilty, and not counsel's failure to present an insanity defense at trial." See generally *Commonwealth* v. *Saferian,* 366 Mass. 89, 96 (1974).

In his testimony before the Superior Court in 1998, Mr. Young testified that he had no memory of ever having seen the transfer orders, the Tomich report, or the Hardman report. However, the judge concluded — as to the critical issue of whether Mr. Young had any reason to question the defendant's criminal responsibility — "[w]hile the defendant's psychiatric history indicates he has engaged in prior violent and assaultive behavior, it does not lend itself to the automatic conclusion that the defendant lacked

the criminal capacity to commit the instant crime in September, 1987. Given the strength of the Commonwealth's evidence against the defendant, Attorney Young's failure to investigate a lack of criminal responsibility defense *based upon a passing recommendation for further evaluation by one physician* does not rise to the level of ineffective assistance of counsel" (emphasis added).

Implicit in the judge's memorandum is the finding that Mr. Young was aware of the "defendant's psychiatric history" which certainly would have included the Hardman report, the Tomich report, and the transfer findings and orders.[5] Among those documents, the most striking was the "referral question" framed by Dr. Tomich: "whether he [the defendant] is criminally responsible." To this we add Dr. Hardman's pointed recommendation that the defendant be comprehensively examined.

Any ordinary, fallible lawyer, in our opinion, would have promptly done the work necessary to arrive at an answer to Dr. Tomich's question; the defendant's case, from any point of view, offered no other defense. Whether Mr. Young read the defendant's psychiatric history and did nothing, or simply neglected altogether to read the history provided to him, is of no consequence. In either event his conduct would have fallen "measurably below that which might be expected from an ordinary fallible lawyer." *Commonwealth* v. *Saferian*, 366 Mass. at 96. What was lacking, on any view of Mr. Young's performance, was any evidence at all that he pursued the question Dr. Tomich presented: was the defendant criminally responsible for his conduct during the stabbing episode? The bizarre nature of the crime itself, and the defendant's long history of psychiatric difficulties and hospitalizations, as well as the detailed findings and opinions in the transfer orders, and the opinions of Tomich and Hardman, all of which were delivered to Mr. Young (as the judge found), or were, at the very least, accessible to him, provided an abundance of notice that an investigation was required. In the circumstances presented, "the

---

[5]During his cross-examination by the Commonwealth, Mr. Young at the 1998 evidentiary hearing was asked, "Mr. Young, you have no reason to dispute [that] the Commonwealth provided you with all the discovery, correct?" Mr. Young responded, "No." This response, coupled with the defendant's September, 1989, letter to the Board of Bar Overseers (in which he acknowledged having received "all discovery" — see text, *supra*), provides adequate support for the judge's implicit finding that Mr. Young was aware of the defendant's "psychiatric history."

ordinary fallible lawyer would have at least undertaken an investigation of the viability of presenting expert psychiatric testimony in defense of a client." *Commonwealth* v. *Roberio*, 428 Mass. at 280. Contrast *Commonwealth* v. *Harris*, 387 Mass. 758, 762 (1982) (no ineffective assistance of counsel where defendant had no history of mental disturbance or treatment and the findings of the psychiatrist indicated "no more than a mere possibility that under stress the defendant might be capable of serious acts . . .").

The critical error by the judge was his failure to recognize after the evidentiary hearing what was obvious to him at the plea hearing, and was underscored by the hearing evidence — that there was something "wrong" with the defendant, and that an evaluation should have been sought, as the judge put it, "to find out why he has these aggressive tendencies." The failure to appreciate that Mr. Young should have requested such an evaluation was error. The defendant was deprived of effective representation of counsel as guaranteed by the State and Federal Constitutions.

The order denying a new trial is reversed. The motion for a new trial is to be allowed, and the case is remanded to the Superior Court for further proceedings.

*So ordered.*